[855 NYS2d 106]

THE PEOPLE OF THE STATE OF NEW YORK, Respondent, v
JONATHAN MATTOCKS, Appellant.

First Department, April 16, 2008

**APPEARANCES OF COUNSEL**

*Richard M. Greenberg, Office of the Appellate Defender*, New York City (*Brian P. McCloskey* and *Sara Gurwitch* of counsel), for appellant.

*Robert M. Morgenthau, District Attorney*, New York City (*Gina Mignola* of counsel), for respondent.

**OPINION OF THE COURT**

NARDELLI, J.

The primary issue raised on this appeal is whether a New

York City transit MetroCard, which had been altered so that it could be used to enter the subway system when it contained a zero balance, satisfies the statutory definition of a forged instrument as set forth in Penal Law § 170.00.

Defendant Jonathan Mattocks, by New York County indictment No. 5481/05, filed on October 26, 2005, was charged with 14 counts of criminal possession of a forged instrument in the second degree. Defendant subsequently filed an omnibus motion in which he sought to suppress all of the physical evidence seized from him, as well as any statements made to the police following his arrest. The motion court, in a decision and order entered January 31, 2006, denied defendant's application for a *Mapp/Dunaway* hearing on the grounds that the allegations of fact set forth by the defense were insufficient to warrant a hearing, and that defendant had not satisfactorily demonstrated standing to move to suppress the evidence. That branch of defendant's motion which sought a *Huntley* hearing was granted, and a hearing was held on April 26, 2006, after which the hearing court denied defendant's application to suppress his statements to the police.

Testimony educed at trial reveals that on October 19, 2005, at approximately 12:25 A.M., New York City Police Officers Jermaine Matos and Herman Valentin were on routine patrol, in uniform, in the subway station located at 125th Street and Lexington Avenue, New York, New York. Officer Matos stated that he was ascending the stairs from the northbound platform when he observed defendant picking up MetroCards from the floor. Officer Matos then entered an office utilized by Metropolitan Transportation Authority (MTA)[1] personnel in order to observe defendant without being detected, and watched as defendant proceeded back and forth from a MetroCard reader to the turnstiles, swiped MetroCards, bent them along the magnetic strip, and approached riders while trying to solicit them. Officer Matos asserted that in the three to five minutes he was in the office, he observed defendant use the bent Metro-Cards to swipe two riders into the subway in exchange for money. Officer Valentin, on the other hand, viewing defendant from a different perspective, testified that he was approximately 50 feet away from the turnstiles and saw defendant swipe three

---

1. The Metropolitan Transportation Authority is a public service corporation created for the purpose of developing and improving commuter transportation and other services related thereto within the metropolitan commuter transportation district (Public Authorities Law § 1264 [1]).

riders into the subway. The officers both testified that they kept in contact with each other over their portable radios while observing defendant.

Officer Matos subsequently exited the office, approached defendant and said "hey," which prompted defendant to run up the stairway toward the street. Officer Matos apprehended defendant in the stairwell and, during a search incident to arrest, Officer Valentin recovered 14 MetroCards from defendant, all of which were creased on a specific spot of the magnetic strip, as well as $3 from defendant's pocket.

Dr. James Eastman testified as an expert for the People regarding the MetroCard security system and explained that each MetroCard has a black magnetic strip that is electronically encoded with information, including the card's unique serial number. Each time a card is swiped at a turnstile and someone gains entry, the MTA's computer system reads and records the information stored on the card, maintaining a history of every MetroCard transaction.

Dr. Eastman pointed out that for value-based cards, which are limited to a specific dollar amount, information concerning the card's value is stored electronically on two variable fields on the magnetic strip and when swiped, both variable fields are read by the computer. If the turnstile computer grants access, it then deducts the cost of a ride and writes the remaining value onto the card. Dr. Eastman stated that the electronic notation reflecting the deduction is made in only one of the fields and, with each successful swipe, the computer deducts the appropriate value from alternating fields. Dr. Eastman, by way of example, explained that a MetroCard purchased for $4 initially registers that amount in both fields and, when used for the first time, the computer deducts the $2 fare from only one field, leaving the other field at $4. The second time the card is utilized, the computer deducts $4 from the field containing the $4 amount, writes in a new amount of zero, and leaves the notation of $2 in the remaining field. Dr. Eastman stated that the reason for the double-field system is that in case of a computer writing error, or if the card is damaged, there is always a backup field to give the rider "the benefit of the doubt."

Unfortunately, as Dr. Eastman explained, the system can be circumvented by purposely damaging the field on the magnetic strip which indicates the card has a zero balance by creasing or bending it precisely where the zero-value field is located, thereby destroying the information contained in that field. Dr. Eastman

further noted that the zero-value field is generally located at a specific part of the magnetic strip and, once that information is destroyed, the computer then relies on the remaining field and reads a value of $2, enabling a passenger to enter the subway system without paying the fare. In order to gain admittance in this manner, however, the card must be swiped twice, although the swipes do not have to be consecutive. Accordingly, an individual attempting to create and then sell a free ride can swipe the card once at a turnstile and then return later, once a willing customer is found, to swipe the card a second time to procure entry.

Dr. Eastman testified that of the 14 cards recovered from defendant, all had magnetic strips that had been creased or tampered with; 11 had a zero balance remaining on them, but none of them had last been used at the station where defendant was apprehended; 3 of the 11 cards had been successfully altered and could have been used for a free ride; and two of the cards had $2 remaining on them.

Robert Fraser, a station agent in the employ of the MTA who was assigned to the token booth on the night defendant was arrested, testified for the defense that when he began his shift, he noticed "a large amount of males," between the ages of 8 and 12, "loitering in the mezzanine area" and observed them "selling swipes at the turnstiles." Fraser notified Station Command at the MTA and, approximately one hour later, he saw the police apprehend a man, although he did not see who was apprehended.

Defendant was subsequently convicted by a jury, on May 11, 2006, of one count of criminal possession of a forged instrument in the second degree[2] and on June 7, 2006, the sentencing court adjudicated defendant a second felony offender and imposed a sentence of from 2 to 4 years' imprisonment. Defendant appeals and asserts that the People failed to prove, by legally sufficient evidence, that the bent MetroCards found in his possession meet the statutory definition of a forged instrument. Defendant premises his argument on the assertion that a bent MetroCard no longer resembles an authentic MetroCard to the human eye and, thus, does not replicate the original in all ways. Defendant, however, neglects to argue the alternative: that even assuming a bent MetroCard is, in fact, a forged instrument, the evidence

---

**2.** The trial court, rather than submit a separate count for each Metro-Card, determined to submit only one count to the jury. Defendant did not object to this determination.

was still legally insufficient to establish his guilt. Defendant further maintains that in any event, the forgery statute was not the appropriate statute to have charged him under since the Legislature had enacted a specific provision which prohibits his alleged conduct as a misdemeanor (Penal Law § 165.16).

Since we find defendant's arguments to be unavailing, we now affirm.

Penal Law § 170.25 provides that: "A person is guilty of criminal possession of a forged instrument in the second degree when, with knowledge that it is forged and with intent to defraud, deceive or injure another, he utters or possesses any forged instrument of a kind specified in section 170.10."

A forged instrument is defined as a "written instrument which has been falsely made, completed or altered" (Penal Law § 170.00 [7]), and such instruments can include "tokens, public transportation transfers, certificates or other articles manufactured and designed for use as symbols of value usable in place of money for the purchase of . . . services" (Penal Law § 170.10 [4]). We harbor no doubt, and defendant does not dispute, that a MetroCard, which in substance is a computerized ticket specifically designed to replace tokens, falls squarely within the foregoing definition. Further, Penal Law § 170.00 (1) defines a "written instrument" as:

> "[a]ny instrument or article, including computer data or a computer program, containing written or printed matter or the equivalent thereof, used for the purpose of reciting, embodying, conveying or recording information, or constituting a symbol or evidence of value, right, privilege or identification, which is capable of being used to the advantage or disadvantage of some person."

Here, it is clear, and defendant makes little effort to convince us otherwise, that a MetroCard, with its encoded "computer data," which is used for the purpose of "conveying or recording information" and is "capable of being used to the advantage . . . of some person," is a "written instrument" as defined by Penal Law § 170.00 (1). Rather, the crux of defendant's argument is that a bent MetroCard has not been "falsely altered" as defined in the Penal Law.

Penal Law § 170.00 (6) states that:

> "[a] person 'falsely alters' a written instrument when, without the authority of anyone entitled to

grant it, he changes a written instrument, whether it be in complete or incomplete form, by means of erasure, obliteration, deletion, insertion of new matter, transposition of matter, or in any other manner, so that such instrument in its thus altered form appears or purports to be in all respects an authentic creation of or fully authorized by its ostensible maker or drawer."

Defendant maintains that the MetroCards in question do not fit within the above statutory definition because a bent MetroCard no longer resembles an authentic MetroCard to the human eye. The flaw in defendant's argument, however, is that it is not whether the MetroCards appear authentic to the human eye that is pivotal herein but, rather, whether the card appears authentic to the electronic eye of the scanning device embodied in the subway turnstiles. Thus, to be "falsely altered," a written instrument need not be perfectly altered. Here, the magnetic strips incorporating the computer data on certain MetroCards, which contained no valid fare, were altered so that the cards would appear, and be read, as authentic for the admission of a rider by the turnstile computers. Thus, the MetroCards in question, in their altered form, "appear[ ] or purport[ ] to be in all respects an authentic creation of or fully authorized by [their] ostensible maker or drawer" (*see generally People v Owens*, 12 Misc 3d 600 [2006]; *People v Roman*, 8 Misc 3d 1026[A], 2005 NY Slip Op 51291[U] [2005]).[3] Thus, the MetroCards in question were, pursuant to the statutory definition, "falsely altered."

■ In addition, we reject defendant's argument that because the conduct at issue falls within the ambit of a different statute which provides for a lesser penalty (*see* Penal Law § 165.16 ["Unauthorized sale of certain transportation services"]), prosecution under the forgery statutes was improper. It is settled that "[a]s a general rule, a statutory prohibition against a particular type of conduct will not be deemed to constitute the exclusive vehicle for prosecuting that conduct unless the Legislature clearly intended such a result" (*People v Duffy*, 79 NY2d 611, 614 [1992]). In this matter, we can discern no such legislative prohibition, nor does defendant identify one, which might preclude defendant's prosecution under the forgery statutes.

---

**3.** We find no merit in defendant's alternative argument that because the data in one of the fields in the magnetic strip was destroyed, it cannot be deemed "altered" for the purposes of the statute, since Penal Law § 170.00 (6) specifically contemplates the "obliteration" of encoded data.

 Finally, defendant maintains that the hearing court erred in summarily denying his motion for suppression because he alleged sufficient facts to raise a question regarding whether the police had probable cause to arrest him, and his sworn statement of fact, in which he asserted that he was not engaging in any conduct other than seeking shelter and meeting with local acquaintances, was more than sufficient to warrant a *Mapp/Dunaway* hearing. Further, defendant avers that the hearing court erred when it held that he did not have standing to move to suppress the evidence, having based its conclusion on the erroneous proposition that a defendant must claim ownership of the evidence in question in order to have standing to move to suppress it.

With regard to the standing issue, as the People concede, the Court of Appeals, subsequent to the hearing court's determination, has made it clear that a defendant is not required to personally admit possession of contraband in order to comply with the factual pleading requirements of CPL 710.60 (*see People v Burton*, 6 NY3d 584, 589 [2006]). Rather, a defendant can shoulder his evidentiary burden by utilizing a police officer's statement that the tangible property in question was seized from defendant's person (*id.*; *People v Johnson*, 42 AD3d 341, 343 [2007]; *People v Jenkins*, 32 AD3d 745, 746 [2006]). In the matter at bar, since the police officers alleged in their complaint that they recovered the 14 MetroCards from defendant, we conclude, on that basis, that he retained standing to seek suppression of the physical evidence.

Notwithstanding the foregoing, defendant's motion was properly denied. CPL 710.60 (1) requires that a suppression motion be in writing, state the grounds upon which it is based, and "contain sworn allegations of fact, whether of the defendant or of another person or persons, supporting such grounds." A court may summarily deny a motion to suppress if the movant's papers do not allege a ground constituting a legal basis for suppression, or the sworn allegations fail, as a matter of law, to support the ground alleged (CPL 710.60 [3]; *People v Burton*, 6 NY3d at 587; *People v Jones*, 95 NY2d 721, 725 [2001]). In assessing the sufficiency of the defendant's factual allegations, and whether the defendant is entitled to a hearing, the Court of Appeals in *People v Mendoza* (82 NY2d 415, 426 [1993]) provided the following guidance: "[T]he sufficiency of defendant's factual allegations should be evaluated by (1) the face of the pleadings, (2) assessed in conjunction with the context of the motion, and

(3) defendant's access to information." It must also be borne in mind that "[h]earings are not automatic or generally available for the asking by boilerplate allegations" (*id.* at 422; *see also People v Long*, 36 AD3d 132, 133 [2006], *affd* 8 NY3d 1014 [2007]).

In the matter at bar, the complaint clearly alleged that the police officers observed defendant taking money from individuals in exchange for defendant providing them access to the subway system by using MetroCards. The complaint further alleged that 14 MetroCards, which had been altered in a manner so as to allow access to the subway system despite the fact that the cards had a zero balance, were recovered from defendant. Defendant, in response, provided a general denial that he was engaged in criminal activity at the time of his arrest, and failed to address any of the specific allegations against him. Pointedly, defendant did not deny he had taken money from three individuals, or that in exchange for the money, he provided them access to the subway system. Rather, defendant merely asserted that he was "seeking shelter and speaking with various neighborhood acquaintances." Since defendant failed to controvert the specific information provided by the People concerning the criminal activity which formed the predicate for his arrest, or to set forth any other basis for suppression, the court properly denied his application for a *Mapp/Dunaway* hearing (*People v Arokium*, 33 AD3d 458, 459 [2006], *lv denied* 8 NY3d 878 [2007]; *see also People v Scott*, 44 AD3d 427, 428 [2007], *lv denied* 9 NY3d 1009 [2007] [concluding assertions of innocent behavior are insufficient to controvert specific allegations of criminal activity]).

Accordingly, the judgment of the Supreme Court, New York County (Charles H. Solomon, J., on pretrial motion; Marcy L. Kahn, J., at jury trial and sentence), rendered June 7, 2006, convicting defendant of criminal possession of a forged instrument in the second degree, and sentencing him, as a second felony offender, to a term of imprisonment of 2 to 4 years, should be affirmed.

ANDRIAS, J.P., WILLIAMS, McGUIRE and ACOSTA, JJ., concur.

Judgment, Supreme Court, New York County, rendered June 7, 2006, affirmed.